The BABCOCK & WILCOX
COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 80–5–00772.

United States Court of International Trade.

Aug. 20, 1981.

Harris, Berg, & Creskoff, Washington, D. C. (Stephen M. Creskoff and Eric I. Garfinkel, Washington, D. C., at the oral argument); deKieffer, Berg & Creskoff, Washington, D. C. (Donald E. deKieffer and Eric I. Garfinkel, Washington, D. C., on the briefs), for plaintiff.

Stuart E. Schiffer, Acting Asst. Atty. Gen. (Joseph I. Liebman, Washington, D. C., Attorney in Charge, Field Office for Customs Litigation, Francis J. Sailer, Washington, D. C., at the oral argument and on the brief), for defendant.

Coudert Brothers, Washington, D. C. (Charles R. Stevens, Milo G. Coerper, Sherman E. Katz and John D. Maiers, Washington, D. C., of counsel), for Sumitomo Metal Industries, Ltd., amicus curiae.

Steptoe & Johnson, Washington, D. C. (Monroe Leigh, Daniel J. Plaine, Fred S. McChesney and Alice L. Mattice, Washington, D. C., of counsel), for Nippon Steel Corp., amicus curiae.

RICHARDSON, Judge:

In these consolidated actions instituted by plaintiff pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a to review negative injury determinations of the United States International Trade Commission ["Commission"] in Investigation No. 731–TA–15 (Preliminary) relative to pipes and tubes of iron or steel from Japan, made on April 14, 1980, and June 24, 1980, respectively, plaintiff has moved pursuant to Rule 56.1 for determination of the issues in its favor upon an agency record, and defendant has cross-moved for affirmance of the Commission's determinations upon the record.

It appears from the record that on February 28, 1980, plaintiff, a domestic producer of steel pipes and boiler tubes, among other things, filed a petition simultaneously with the Department of Commerce ["Commerce"] and the Commission alleging that Japanese producers of certain pipes and tubes of steel were selling their products at less than fair value ["LTFV"] in contravention of the antidumping provisions of the Trade Agreements Act of 1979 [Pub.L.No. 96–39, 93 Stat. 144 (July 26, 1979)]. LTFV sales were alleged with respect to the following products:

(1) welded carbon steel boiler tubes (TSUS item 610.3205);

(2) seamless carbon steel boiler tubes (TSUS item 610.4920);

(3) seamless stainless and heat resisting steel boiler tubes and process pipes (TSUS items 610.5210 and 610.5215);

(4) seamless alloy steel tubes for bearings (TSUS item 610.4600); and

(5) seamless alloy steel boiler tubes and process pipes (TSUS item 610.5270).

On March 25, 1980, Commerce determined that plaintiff's petition was sufficient to initiate an investigation which it then commenced. However, Commerce declined to include within the scope of its investigation seamless alloy steel tubes for bearings (TSUS item 610.4600) because it was of the opinion that plaintiff did not furnish sufficient information to support the allegation of LTFV sales as to that product [45 Fed. Reg. 19284 (1980)].

Acting upon instructions from Commerce the Commission initiated Investigation No. 731–TA–15 (Preliminary) to determine whether there existed a *reasonable indica-*

*tion* that a domestic industry is, or has been materially injured or threatened with material injury by reason of LTFV imports of TSUS items 610.3205, 610.4920, 610.5215, and 610.5220 from Japan [45 Fed.Reg. 16051 (1980)].

On April 9, 1980, by a vote of 3–2, the Commission made an affirmative determination of *reasonable indication* of material injury or threat thereof to the welded carbon boiler tube industry (TSUS item 610.-3205), and a negative injury determination with respect to the seamless boiler tube and process pipe industry (TSUS items 610.4920, 610.5210, 610.5215, and 610.5270).

Thereafter, and on June 18, 1980, the Commission reopened Investigation No. 731–TA–15 (Preliminary) to *reconsider* import statistics relating to welded carbon boiler tubes (TSUS item 610.3205) which was said to be erroneous [45 Fed.Reg. 42898 (1980)]. And, after *reconsidering* corrected statistical data regarding TSUS item 610.-3205, the Commission, by a vote of 4–1 made a negative injury determination on June 24, 1980, with respect to the welded carbon boiler tube industry [45 Fed.Reg. 47769 (1980)].

Plaintiff contends that the Commission's negative injury determinations in its preliminary investigation were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Plaintiff argues that the Commission's concept of the relevant industries is at variance with the mandatory requirements of the Trade Agreements Act of 1979, which has resulted in the Commission's utilization of overbroad and irrelevant injury data at the expense of pertinent injury data from domestic producers not addressed by the Commission. Plaintiff also argues that the Commission was without statutory authority to reopen the preliminary investigation for reconsideration of its determination upon additional evidence.

Defendant contends that the record supports the Commission's findings as to the absence of a *reasonable indication* of material injury or the threat thereof to the domestic industries assessed by the Commission, in which contention it is joined by *Amicus Curiae* Sumitomo Metal Industries, Ltd. and Nippon Steel Corp., foreign producers and exporters of the pipe and tube products investigated. Defendant argues that the best information available to the Commission indicated that the several products plaintiff sought to have investigated had no separable identities, and that the only distinction between products which industry practice allowed was as between seamless and welded pipe and tube products.

Defendant also contends that the Commission possesses discretionary and inherent authority to reopen proceedings and reconsider its decisions. In this contention defendant is joined by *Amicus Curiae* Nippon Steel Corporation, a foreign producer of the pipe and tube products covered by the investigation. Defendant argues that, given the posture of this case, especially in view of the "egregiously erroneous" information relied upon, this court would have had little choice but to remand the case to the Commission; and the Commission's actions merely obviated this circuitous procedure, and attained the mandated corrected result without adversely affecting plaintiff's right of judicial review.

The views of the Commissioners on these issues are diverse. First, with respect to scope of the industry, Chairman Bedell and Commissioner Moore stated:

The three seamless products—are all produced by essentially the same production methods, on the same machinery, and by the same workers. For these reasons, we have assessed the effect of the allegedly dumped imports on the U.S. industry . . . in relation to the aggregate U.S. production of the three seamless pipe and tube items. (Pub.Doc. 57, p. 5)

Commissioner Stern stated:

In this case, where there is no absolutely clear answer to the question of scope of the domestic industry impacted by imports, it is my judgment that the information on the record in this investigation does not permit assessment by separate and identifiable product lines. Therefore,

guided by the law's directive to make my findings on the basis of the best information available to the Commission at this time, I have determined that reasonable indication of injury to the domestic industry must be assessed with respect to boiler tubes and process pipes. (Pub.Doc. 57, p. 21)

Commissioner Alberger stated:

I am uncertain whether it is feasible for a product such as seamless stainless boiler tubes . . . to be analyzed as a separate "product line" as defined by Section 771(4)(D) of the Trade Agreements Act of 1979. The record contains some information that suggests there may be good reason to make a product line distinction among the three seamless products under investigation. Further investigation would provide a better indication. Specific data are available on shipments, exports, and imports for each of the three categories of seamless pipe and tube and the one welded pipe and tube product under investigation. Only the petitioner was able to provide profit and loss data on each of these four products. Other manufacturers were apparently unable to provide such data, due to difficulty in allocating profits between products made on essentially the same machinery by the same employees. Petitioner has the same problems, but nevertheless was able to make the allocation. It is important to note that petitioner accounts for a very substantial proportion of domestic production of each item. (Pub.Doc. 57, p. 10)

And Commissioner Calhoun stated:

That the petitioner was able to supply data on four separate products implies the possibility of four distinct product lines against which the Commission must apply section 771(4)(D). In the time available, however, none of the other domestic producers was able to provide similar disaggregated data. This inability of the other domestic producers to provide similar disaggregated data results in confusion as to the precise character of the industry. (Pub.Doc. 57, p. 27)

Secondly, with respect to reconsideration of the Commission's affirmative preliminary injury determination of April 14, 1980, only two of the Commissioners made significant comment at the time of voting on June 24, 1980.

Commissioner Stern, who voted for reversal, stated:

I think that I should just briefly say that as far as I'm concerned that we are conserving a great deal of Commission energy in expressing our concern for the public because we are not, in fact, dealing with new facts. In other words, this is not a further fact finding for which we are reopening the vote, but we're dealing with the same old facts. The problem was that the facts that were given were inaccurate and we are simply responding quite immediate to what was immediately recognized upon publication of our report that there were inaccuracies there. I don't believe that this is setting any precedence that we will open a case after 45 days for new facts and go into future fact finding exercises and on the product line question as far as I was concerned I voted in the negative across the board because I felt that the facts were such . . . the demand question was such that making these distinctions by product line was belying what the facts concerning demand in this case dictated. The changed information which is now available to the Commission only reinforces my original negative determination that I made in this preliminary investigation including on the question of welded carbon steel boiler tubes. And as far as I'm concerned my original views on this stand in tact. (Pub.Doc. 78, pp. 4–5)

And Commissioner Calhoun, who voted for affirmance, stated:

. . . under the statutory scheme of the '79 Act, I think we're required to reach preliminary determinations within 45 days in cases alleging subsidy or dumping and that the legislative history makes clear that the Congress recognizes the difficulties that can arise where the decision making must take place based upon infor-

mation collected over a short period of time necessarily requires us to render decisions based upon best information available. It is understandable, I think, for us to be uncomfortable, if not concerned, for subsequent preliminary determination informations presented which might change the outcome. In such circumstances the concern seems most acute where we vote to end the investigation and subsequent information tends to support continuation of that investigation. But in circumstances compelling much less concern, I think we have one before us today. Clearly, it is burdensome in any case on both parties and the Commission to proceed with an investigation were [sic] evidence subsequently received might tend to make further inquiry unnecessary. But in such cases the procedures under the '79 Act well provide for the orderly treatment of the dilemma posed by receipt of information subsequent to an affirmative preliminary vote and this procedure is called a final investigation. I think in [sic] both sound policy and in the overall interest of the conservation of Commission, and, thus, public resources that in this kind of circumstance we should integrate the new data into the final investigation in absence of extraordinary circumstances such as, but certainly not limited to, typographical errors, clerical errors or wilful misrepresentation. Preliminary investigations should not be open because absent such a policy the Commission would [sic] faced with a regular flow of requests for opening preliminary determinations as further fact finding reveals more telling information. In these cases we would be required to undertake in many cases and parallel with final investigations some investigation relating to the request for opening the vote. Thus, we would waste resources and there would never be, really, an end to an affirmative preliminary investigation until our final determination was reached. I do not think policy nor the intent of the statute supports such a circumstance.... (Pub.Doc. 78, pp. 3–4)

Turning first to the issue of industry scope, it is to be noted that prior to the enactment of the Trade Agreements Act of 1979 the Commission had a broad grant of discretion in delineating the relevant domestic industry against which it was required to assess the effects of LTFV imports. Neither the Anti-dumping Act of 1921, nor section 303 of the Tariff Act of 1930 defined the term "industry". See S.Rept.No. 96–249 to accompany HR. 4537, 96th Cong., 1st Sess., p. 82 (1979), U.S.Code Cong. & Admin.News 1978, p. 381. The Trade Agreements Act of 1979 contains specific guidelines for the determination of the relevant "industry" or "industries", as the case may be.

Section 771(4)(A) of the Tariff Act of 1930, as amended (19 U.S.C. § 1677(4)(A)) defines the term "industry" as

the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product.

And the term "like product" mentioned in section 771(4)(A) is defined in section 771(10) of the Tariff Act of 1930, as amended (19 U.S.C. § 1677(10)) as

a product which is like or in the absence of like, most similar in characteristics and uses with, the article subject to investigation under this title.

Also, Congress has provided guidelines for the application of these terms by the Commission in connection with product line assessments. Section 771(4)(D) of the Tariff Act of 1930, as amended (19 U.S.C. § 1677(4)(D)) states in relevant part

The effect of ... dumped imports shall be assessed in relation to the United States production of a like product if available data permit the separate identification of production in terms of such criteria as *the production process or the producer's profits*. If the domestic production of the like product has no separate identity in terms of such criteria, then the effect of the ... dumped imports shall be assessed by the examination of the production of the narrowest

group or range of products, which includes a like product for which the necessary information can be provided. (Emphasis added.)

It will be observed that section 771(4)(D) stresses the utilization of the applicable criteria *alternatively*, i. e., production process or the producer's profits. And profits, it would appear, heads the list of economic factors which Congress intended the Commission to examine in ascertaining the impact of LTFV imports on the domestic producers comprising the "industry". See: S.Rept. 96–249 to accompany H.R. 4537, 96th Cong., 1st Sess., p. 83 (1979).

Although the producer's questionnaires distributed by the Commission did not solicit profit information from the domestic producers of the subject boiler tubes and pipes (Conf.Doc. 18–25), the Commission's findings for the most part seem to indicate that all but one of the domestic producers of these products were unable to furnish the Commission with profit information. The court is unable to find that fact documented in the records before it. What does appear in the record, however, is that profit data was voluntarily supplied by plaintiff to the Commission covering each of the products under investigation, which generated the Commission's comments about profit data *as noted above*. There is *nothing in the* record to indicate that the Commission ever solicited profit data pertaining to the investigated products from the domestic producers who, together with plaintiff, were responsible *for 90 percent of the total domestic output of boiler tubes and pipes*.

■ There is no question but that section 771(4)(D) must be read as permitting the separate assessment of products for which profit can be identified even if multiple products are produced by the same production force. The key is profit *accountability*.

■ The Commission's practice of rigidly adhering to a preference for isolation of all production factors supporting a product as a predicate for ascertaining the scope of an "industry" is not in step with the more flexible standard devised by Congress in

section 771(4)(D). But, in any case, it is clear that Congress intended that petitioners in antidumping proceedings should have a choice. In this regard the Senate Finance Committee report states:

In examining the impact of imports on the domestic producers comprising the domestic industry, the ITC should examine the relevant economic factors (such as profits, productivity, employment, cash flow, capacity utilization, etc.), as they relate to the production of only the like product, if available data permits a reasonably separate consideration of the factors with respect to production of only the like product. If this is not possible *because*, for example, *of the accounting procedures in use* or practical problems in distinguishing or separating the operations of product lines, then the impact of the imports should be examined by considering the relevant economic factors as they relate to *the production of the narrowest group or range of products which includes the like product and for which available data permits separate consideration.* (Emphasis added.)

■ It appears that plaintiff's profit data was disregarded by the Commission because of its self-serving nature. However, the self-serving nature of the data should not be defeating, given the Commission's investigatory function to verify data received. Congress anticipated that petitioners in antidumping proceedings would have a stake or interest in developing the relevant facts supporting a dumping finding. Not only should the Commission have considered plaintiff's profit data in connection with its determination as to the scope of the "industry", it should have sought such data from the other domestic producers comprising the boiler tube and pipe industry before moving to the broader industry which even the Commission's own staff acknowledges to have been a mistake. (Pub.Doc. 50, p. 7) That such other domestic producers might also have been able to isolate profit on a product-by-product basis is indicated in the Quanex Corporation's response to the Commission's questionnaire wherein it is stated, "The boiler tube mar-

ket erosion caused by Japanese has taken place over a period of time and the displacement of this business has been offset by a change in product mix." (Conf.Doc. 22, p. 8)

■ Expansion of the Commission's inquiry to other domestic producers' profits on a product-by-product basis would have given the Commission a better overview of the impact of LTFV imports on domestic producers. It is not enough for the Commission to have singled out plaintiff's ability to increase prices in the face of a shrinking market share as being indicative of the state of good health of the industry, given plaintiff's position as the acknowledged price leader, without knowing what experiences the other domestic producers were having in the face of import penetration attributable to LTFV sales. In this connection, it is noteworthy that Republic Steel declined to bid against the LTFV sales, noting "Customers are reluctant to give us lost sales to Japanese competitors in detail. However, we are attaching documentation of actual quotations made to our customers which we chose not to meet." (Conf.Doc. 23, p. 8)

Moreover, such a stalwart in the steel industry as United States Steel had withdrawn from the boiler tube market, stating, "The reason U. S. Steel discontinued producing welded and seamless boiler tubes was due in part to foreign imports. It was not feasible for U. S. Steel in the face of rising production costs and depressed prices from imports to make capital investment to continue to participate profitably in this market." (Conf.Doc. 25, p. 2)

■ On the record in this case the court agrees with plaintiff that the Commission erred as a matter of law in failing to properly apply the directives of section 771(4)(D) in determining the scope of the "industry" or "industries" against which to assess the effects of LTFV imports upon the like products being investigated, in consequence of which, the Commission's determination of April 14, 1980, is not in accordance with law.

The court also agrees with plaintiff that the Commission's determination of June 24, 1980, is unlawful. It is not denied by defendant that there is no statutory authorization for the Commission to reopen a terminated preliminary investigation and reconsider its determination in the light of additional evidence. What authority there is to support this course of action is said by defendant to rest in inherent agency authority to modify or correct its decisions. However, it is a well settled principle of administrative law that a governmental agency has only those powers which are granted to it by statute. 73 C.J.S. § 48 (1951).

In any case, whatever may be the extent of the Commission's inherent authority to reconsider its decisions in the light of additional evidence, it is clear that the exercise of such authority must yield to a contrary legislative policy manifest in the governing statutes. Section 733(a) of the Tariff Act of 1930, as amended (19 U.S.C. § 1673b(a)) specifically limits the Commission to making a preliminary determination on the basis of the best information available within 45 days. And the Senate Finance Committee report emphasizes that "This determination would have to be made within 45 calendar days ...." See: S.Rept. 96–249 to accompany H.R. 4537, 96th Cong., 1st Sess., p. 64 (1979), U.S.Code Cong. & Admin.News 1979, p. 450. Other passages in the legislative history indicate that a major objective of the revision is to reduce the length of the investigations undertaken by the Commission (Id., 66), and also to discourage the practice of time-consuming verification of data furnished as a preliminary matter (H.Rept. 96–317 to accompany H.R. 4537, 96th Cong., 1st Sess., p. 62 (1979))—both of which circumstances are involved in the *reconsideration* undertaken by the Commission in this case.

Moreover, the House Ways and Means Committee report states, "The investigative time periods contained in the bill are stated in terms of the maximum time available to the Authority and the ITC to make their determinations. The Committee intends that these time periods be treated as maxi-

mum time periods, and that they not become the general rule. It is expected that wherever any of the determinations required under the bill can be made in a shorter time, they will be so made. (Id., p. 62)

In view of the foregoing legislative history, it is clear that the 45 day time period is *mandatory* and not *directory.* And to the extent that the Committee reopened the preliminary investigation to receive additional evidence and to verify information it had previously acted upon without verification, the reconsideration extends the statutory time period, and as such, is void.

Inasmuch as the ITC did not give proper consideration to product lines nor seek to obtain profit factors in the domestic industry in making its preliminary determination, its finding was unsupported by substantial evidence and not in accordance with law. Also, its reopening a terminated preliminary investigation and reconsidering its determination in the light of additional evidence, after the expiration of the 45 day statutory limit for making its preliminary determination, such action was also not in accordance with law. The motion of plaintiff is granted and defendant's cross-motion is denied.

This matter is remanded to the ITC for disposition consistent with the decision of this court.