287 F.3d 1365
 ALLEGHENY LUDLUM CORP., AK Steel Corporation (formerly Armco, Inc.), Butler Armco Independent Union, J&L Specialty Steel Inc., North American Stainless, The United Steel Workers Of America, AFL-CIO/CLC, and Zanesville Armco Independent Organization, Plaintiffs-Appellants,
v.
UNITED STATES, Defendant-Appellee.
 No. 01-1223.
 United States Court of Appeals, Federal Circuit.
 DECIDED: April 19, 2002.
 
 COPYRIGHT MATERIAL OMITTED Kathleen W. Cannon, Collier Shannon Scott, PLLC, of Washington, DC, argued for plaintiffs-appellants. With her on the brief were R. Alan Luberda and David A. Hartquist.
 Neal J. Reynolds, Attorney, Office of General Counsel, U.S. International Trade Commission, of Washington, DC, argued for defendant-appellee. With him on the brief were Lyn M. Schlitt, General Counsel, and James M. Lyons, Deputy General Counsel.
 Before LOURIE, CLEVENGER, and GAJARSA, Circuit Judges.
 CLEVENGER, Circuit Judge.
 
 
 1
 Allegheny Ludlum Corporation, AK Steel Corporation, Butler Armco Independent Union, J&L Specialty Steel Inc., North American Stainless, The United Steelworkers of America, AFL/CIO/CLC, and Zanesville Armco Independent Organization (collectively "Allegheny"), appeal from a decision of the United States Court of International Trade affirming a Final Determination of the International Trade Commission that the U.S. steel industry was not materially injured by imports of stainless steel coiled plate from Belgium and Canada. Because the Final Determination is flawed as to each of the three statutory factors the Commission is obligated to consider, the decision of the Court of International Trade to affirm is improper. For this reason, we vacate and remand.
 
 
 2
 * Under the statutory scheme established by the Tariff Act of 1930, as amended, American industries may petition for relief from imports that are sold in the United States at less than fair value ("dumped"), or which benefit from subsidies provided by foreign governments. 19 U.S.C. § 1675b (2000). The International Trade Commission ("Commission") is charged with determining whether the imported merchandise in question either materially injures or threatens to materially injure American domestic industry. As part of this material injury analysis, the Commission is obligated to delineate the relevant domestic industry by making a "domestic like product" determination, assessing which domestic product most closely corresponds to the imported merchandise in question. 19 U.S.C. §§ 1677(4), (10).
 
 
 3
 In 1998, responding to a petition for relief by the domestic steel industry, the Commission commenced an anti-dumping inquiry directed towards imported merchandise consisting of stainless steel plate in coils. Following a determination by the Department of Commerce ("Commerce") that the imports were indeed being dumped onto the American market, the Commission evaluated whether these products materially injured domestic industry.
 
 
 4
 In the preliminary phase of the investigation, concluded in May 1998, the Commission found a single domestic like product, namely "certain stainless steel plate in coils." However, in its Final Determination, issued in May 1999, the Commission reached a different conclusion, determining that two domestic like products corresponded to the relevant imports: 1) hot-rolled steel coiled plate and 2) cold-rolled steel coiled plate. The Commission determined that all stainless steel plate in coils fell in one of these two categories.[1] These products differ in their qualities and uses. Cold-rolled plate is thinner and has a smoother finish than hot-rolled plate, and is used in applications such as food processing, beer-making, and dairy containers. In contrast, hot-rolled plate is used in articles such as equipment and storage tanks. As cold-rolled plate requires additional processing, it is more costly than hot-rolled plate. Over 99.9 percent of domestic steel plate production is hot-rolled plate. Because it found hot and cold-rolled steel plate to be two distinctly different products, the Commission considered separately whether the respective domestic industries producing them had been injured by the subject imports of stainless steel plate in coils. The Commission determined that while the domestic hot-rolled steel plate industry had indeed been materially injured by the subject imports, the domestic cold-rolled steel plate industry had not.
 
 
 5
 Before the Court of International Trade, Allegheny challenged both the Commission's determination that hot and cold-rolled steel plate constituted separate domestic like products, as well as the Commission's finding that the domestic cold-rolled steel plate industry suffered no material injury as a result of the imported merchandise.
 
 
 6
 The Court of International Trade affirmed the Commission's Final Determination. Allegheny Ludlum Corp. v. United States, 116 F.Supp.2d 1276 (Ct. Int'l Trade 2000). The Court found that substantial record evidence supported the determination that hot and cold-rolled steel plate constituted separate domestic like products. Id. at 1287-88. As to the determination of no material injury, the Court of International Trade found the Commission's analysis legally flawed as to each of the three factors, volume, price, and impact, that 19 U.S.C. § 1677(7)(B) directs the Commission to consider.[2] Id. at 1288-1307. The Court of International Trade determined that the Commission had grounded its Final Determination of no material injury on an additional basis, that the domestic industry exhibited a "lack of interest" with regard to the market for cold-rolled steel plate. Id. at 1303. Evidence to this effect consisted in large part of statements made by industry representatives before the Commission that cold-rolled steel plate represented an almost negligible market in which domestic manufacturers had no plans to participate. The Court of International Trade affirmed the Final Determination, notwithstanding the errors in the remainder of the Commission's analysis, finding the evidence of the industry's lack of interest sufficient to sustain the overall finding of no material injury. Id. at 1307-8.
 
 
 7
 On appeal to this court, Allegheny challenges only the portion of the decision of the Court of International Trade affirming the Commission's finding of no material injury as to the domestic cold-rolled steel plate industry.
 
 II
 
 8
 We review the Commission's conclusions of law de novo. United States Steel Group v. United States, 96 F.3d 1352, 1356 (Fed.Cir.1996).
 
 
 9
 We review the Court's evaluation of Commission factual determinations by stepping into the shoes of the Court and duplicating its review, Taiwan Semiconductor Indus. Ass'n v. Int'l Trade Comm'n, 266 F.3d 1339, 1343-44 (Fed.Cir.2001), evaluating whether Commission determinations are unsupported by substantial evidence or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i); Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed.Cir.1997).
 
 III
 
 10
 Section 1677(7)(A) defines material injury as "harm which is not inconsequential, immaterial, or unimportant." Section 1677(7)(B) sets forth the factors the Commission is to evaluate in making its material injury determination. It provides that the Commission:
 
 
 11
 (i) shall consider —
 
 
 12
 (I) the volume of imports of the subject merchandise, (II) the effect of imports of that merchandise on prices in the United States for domestic like products, and
 
 
 13
 (III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States; and
 
 
 14
 (ii) may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.
 
 
 15
 19 U.S.C. § 1677(7)(B) (2000).
 
 
 16
 Allegheny asserts that the Commission's analysis of each of the mandatory factors of subsection (i) is unsupported by substantial evidence or otherwise legally incorrect. Specifically, Allegheny contends that the Commission's analysis of both the volume and impact factors employs a faulty interpretation of 19 U.S.C. § 1677(4)(D), while the Commission's analysis of price is unsupported by substantial evidence. Further, Allegheny asserts that the Court of International Trade erred in affirming, despite the errors, the Commission's Final Determination on the basis of the industry's lack of interest in the cold-rolled market, a factor not present in the statutory language cited above. We address each of these contentions in turn.
 
 IV
 
 17
 Both the price and impact components of section 1677(7)(B)(i) key the Commission's material injury determination to an evaluation of the effect of the imported merchandise on the domestic market for the relevant domestic like product. The "product line provision" of the statute provides an exception to this general rule if necessary data is lacking. This provision directs that the effect of subject imports "shall be assessed in relation to the United States production of a domestic like product if available data permit the separate identification of production in terms of such criteria as the production process or the producer's profits." 19 U.S.C. § 1677(4)(D) (2000). In the alternative:
 
 
 18
 If the domestic production of the domestic like product has no separate identity in terms of such criteria, then the effect of the [imports] shall be assessed by the examination of the production of the narrowest group or range of products, which includes a domestic like product, for which the necessary information can be provided.
 
 
 19
 Id. The Commission resorted to this alternative, explaining in the Final Determination that:
 
 
 20
 Because the domestic industry was unable to provide segregated trade and financial data for cold-rolled stainless steel coiled plate, pursuant to the production line provision of 19 U.S.C. § 1677(4)(D), we also assess the effect of the cumulated subject imports on the production of the narrowest group of products that includes cold-rolled plate for which the necessary information could be provided — in this case, all stainless steel coiled plate.
 
 
 21
 Tension exists between the product line provision and the mandatory volume-price-impact analysis of section 1677(7)(B). To the extent that the Commission is entitled to rely on data from a broader category in the absence of specific information from a narrow subcategory, the relevant material injury analysis can be shifted.[3] Any actual effect of the imported goods on the narrower domestic like product market may be effectively submerged, and lost, upon the inclusion of data from a larger set of domestic products.
 
 
 22
 We need not fully explore this latent conflict here. Section 1677(4)(D) clearly contemplates the use of product line data as a matter of last resort, when the relevant like product data is simply nonexistent. The statutory language provides that this product line provision is to be employed when production of the domestic like product "has no separate identity." Further, the relevant Senate report reads:
 
 
 23
 In examining the impact of imports on the domestic producers comprising the domestic industry, the ITC should examine the relevant economic factors (such as profits, productivity, employment, cash flow, capacity utilization, etc.), as they relate to the production of only the like product, if available data permits a reasonably separate consideration of the factors with respect to production of only the like product. If this is not possible because, for example, of the accounting procedures in use or practical problems in distinguishing or separating the operations of product lines, then the impact of the imports should be examined by considering the relevant economic factors as they relate to the production of the narrowest group or range of products which includes the like product and for which available data permits separate consideration.
 
 
 24
 S. Rep. 96-249, at 83-84 (1979) reprinted in 1979 U.S.C.C.A.N 381, 469-70 (emphasis added). These situations are cases in which the domestic like product data is actually unavailable, rather than those in which it is simply difficult to obtain.
 
 
 25
 The Court of International Trade has previously required the Commission to actively attempt to obtain relevant data before resorting to the product line provision. In Babcock & Wilcox Co. v. United States, 521 F.Supp. 479 (Ct. Int'l Trade 1981) vacated, as moot, 4 Ct. Int'l Trade 3, 1982 WL 17525 (1982), a domestic producer of steel pipes and boiler tubes initiated an anti-dumping complaint against certain Japanese manufacturers. The Commission rendered a negative material injury determination. Id. at 482. On appeal to the Court of International Trade, the domestic manufacturer alleged that the Commission had improperly relied on overbroad data for the entire seamless stainless boiler tube industry. The United States, defending the Commission's findings, asserted that such reliance was proper, under section 1677(4)(D), as the several products the plaintiff sought to have investigated had no separate identity. As one commissioner noted, while specific data was available on shipments, exports, and imports for each of the categories of pipe and tube products under investigation, only the petitioner was able to provide profit and loss data on each of these products. Id. at 483.
 
 
 26
 The Babcock court found that despite the fact that the Commission's findings stated that all but one of the domestic producers were unable to furnish the Commission with profit information, there was nothing in the record to indicate that the Commission had ever solicited such profit data from domestic producers other than the petitioner. Finding that the Commission, "should have sought such data from the other domestic producers comprising the boiler tube and pipe industry before moving to the broader industry," id. at 485, the Court of International Trade held that the Commission's determination of no material injury was unsupported by substantial evidence and not in accordance with law, requiring a remand to the Commission for further development. Id. at 487.
 
 
 27
 We note that the language of section 1677(4)(D) permitting resort to alternative product line data is far stronger than that present in the analogous provision of section 1677e(a), allowing Commerce and the Commission to "use the facts otherwise available" if "necessary information is not available on the record," for the purpose of making antidumping duty determinations. 19 U.S.C. § 1677e(a) (2000). Indeed, the actual language of section 1677(4)(D) more closely resembles the language of former section 19 U.S.C. § 1677e(c), stating that Commerce and the Commission "shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form requested, or otherwise significantly impedes an investigation, use the best information otherwise available." 19 U.S.C. § 1677e(c) (1988). This language has been consistently interpreted to require active efforts on the part of the Commission and Commerce to obtain relevant data, prior to invoking the best information rule. Examining a dumping determination by Commerce, the Court of International Trade characterized this duty as one "to reasonably avail itself of its own powers to obtain relevant information in the absence of cooperation by a respondent." Rhone-Poulenc, Inc. v. United States, 927 F.Supp. 451, 457 (Ct. Int'l Trade 1996). In Budd Co. Railway Division v. United States 507 F.Supp. 997, 1001 (Ct. Int'l Trade 1980), the Court of International Trade expressly noted that this information is not limited to "that furnished by the petitioner or by any party-in-interest to the proceedings." Further, as the Commission possesses the authority to issue subpoenas in pursuing its investigations, unlike Commerce, there is an even stronger rationale to believe that the Commission's resort to the product line provision must be accompanied by active efforts on the part of the Commission to acquire relevant data. See Olympic Adhesives, Inc. v. United States, 899 F.2d 1565, 1571 (Fed.Cir.1990).
 
 
 28
 The Commission's efforts do not meet this standard. To the extent the Commission determined that the domestic industry was incapable of supplying such information, it is incorrect. As the Final Determination expressly states in footnote 155, the domestic producers "did provide segregated production and shipment quantity and value data for cold-rolled plate." Indeed, the Final Determination even contains tables referring to domestic cold-rolled plate volume and the market share of cumulated subject imports, attributing this limited data to information supplied by importers. To say that the domestic industry was "unable" to supply relevant cold-rolled plate data can mean only that it was unable to do so because the Commission did not expressly ask for such information. Indeed, noting that the Commission "did not collect price comparison data on any cold-rolled plate products," the Final Determination explains this fact as resulting from the failure of any party to request that the Commission do so. The record does not afford substantial evidence to support the Commission's rationale for resorting to section 1677(4)(D). To the contrary, the record supplies ample evidence to reject the Commission's decision to do so.
 
 
 29
 We also cannot overlook the sequence of the Commission's actions. The domestic industry argued that there should be one, not two, segments of the domestic industry under consideration. The Commission agreed with the domestic industry in its initial determination, stating only that it would reconsider its decision in its Final Determination. The domestic industry did not bear the burden to prove that there are two segments to assess; its litigation strategy was to convince the Commission that only a single segment should be considered. Testimony by domestic industry representatives about the lack of domestic interest in cold-rolled plate, as a result of its small overall volume in the domestic market, was given at the time domestic industry was seeking to convince the Commission to treat cold-rolled plate as part of the overall single domestic market.
 
 
 30
 In the end, the Commission — never having independently collected any pertinent data about a separate domestic cold-rolled plate industry — decided that the domestic industry was divided into two segments. The practical problem it faced was how to justify its ultimate conclusion of no material injury to the cold-rolled plate segment, absent the necessary data. To address this problem, the Commission decided to rely upon a direct comparison of the data for cold-rolled imports with that for the overall domestic market for stainless steel plate.
 
 
 31
 Indeed, the Commission's impact analysis hinges upon this, stating that "we find that subject cold-rolled imports are too small in magnitude to have contributed to the observed declines in the profitability, employment or capacity of the domestic industry producing certain stainless steel plate in coils." The Commission's analysis of volume is inspired by a similar view, noting that "domestic industry's production of cold-rolled plate is very limited and that the industry itself has characterized cold-rolled plate as a tiny and unimportant part of its business."
 
 
 32
 As the Court of International Trade has stated, "[i]t is incumbent on the [Commission] to acquire all obtainable or accessible information from the affected industries on the economic factors necessary for its analysis." Roquette Freres v. United States, 583 F.Supp. 599, 604 (Ct. Int'l Trade 1984). "In so doing, it is clear that all information that is `accessible or may be obtained,' from whatever its source may be, must be reasonably sought by the Commission." Budd Co. Ry. Div., 507 F.Supp. at 1003-04. The Commission may not shirk this duty by asserting a failure of the parties to request that the Commission gather specific information. Indeed, this position has been explicitly rejected. Rhone-Poulenc, 927 F.Supp. at 456-57. We thus conclude that the Commission erred in resorting to the product line provision in assessing the volume and impact of the subject imports.
 
 
 33
 Our decision is not inconsistent with the determination of the Court of International Trade that there was no legal error per se in the failure of the Commission to collect specific data. Allegheny, 116 F.Supp.2d at 1295. The Commission does indeed enjoy discretion to conduct its investigation and gather data it deems relevant. Czestochowa v. United States, 890 F.Supp. 1053, 1075 (Ct. Int'l Trade 1995). However, the Commission is obligated to make active, reasonable efforts to obtain relevant data. This is particularly true when the Commission seeks to invoke its inability to obtain information on a specific domestic like product in order to rely on the product line provision.
 
 
 34
 The Commission's failure to attempt to get relevant data prior to resorting to the product line provision renders the Commission's analysis of the volume and impact factors under section 1677(7)(B) legally unsound.
 
 IV
 
 35
 With regard to the Commission's price analysis, the Court of International Trade found error in the Commission's use of the average unit values ("AUVs") of the subject imports as indicators of specific price trends. The Court of International Trade noted that our decision in United States Steel Group v. United States, 96 F.3d 1352 (Fed.Cir.1996), expressly declined to "hold, as a general rule, that the Commission may not rely on AUV trends as indicative of corresponding changes in price." Id. at 1364. However, the Court of International Trade found that here, as the product mixes of the domestic and foreign merchandise differed, "the fact that for much of the period reviewed the AUVs for subject imports were higher than those for domestic cold-rolled plate, without more, says little about whether there was significant price competition between similarly situated cold-rolled products." Allegheny, 116 F.Supp.2d at 1298.
 
 
 36
 The Commission did indeed rely on AUVs as indicators of specific price trends in determining that there was no material injury, stating that:
 
 
 37
 The average unit value of cumulated subject imports declined steadily over the period of investigation, beginning at a higher level than that for the domestic like product and falling below in 1997 and interim 1998. There is no clear connection between the subject imports and the domestic price declines, since, during much of the period, the domestic price decreased even though subject imports were priced substantially higher.
 
 
 38
 Certain Stainless Steel Plate from Belgium, Canada, Italy, Korea, South Africa, and Taiwan, Inv. Nos. 701-TA-376, 377, and 379 (Final) and Inv. Nos. 731-TA-788-793 (Final), USITC Pub. 3188 at 23-4 (May 1999).
 
 
 39
 This is inaccurate for two reasons, as the Court of International Trade correctly noted. First, the conclusion is logically unsound. Even assuming the Commission's use of AUVs to be proper, the falling prices of the imported merchandise would seem to support a finding of material injury to domestic producers, despite the fact that the subject imports were priced higher than corresponding domestic like products. Second, as the Court of International Trade noted, the AUV data at question here is strongly influenced by a few orders of particular grade or size. Allegheny, 116 F.Supp.2d at 1298. The government does not dispute this, and indeed concedes that "significant product differences [exist] between the domestic and imported merchandise." This seriously undermines the utility of such data.
 
 
 40
 Accordingly, the Commission's price determination is not supported by substantial evidence.
 
 V
 
 41
 In spite of the errors in the Final Determination, the Court of International Trade affirmed the decision of no material injury, finding that "the Commission identified significant evidence showing that the domestic cold-rolled plate industry was not interested in producing and selling cold-rolled plate." Allegheny, 116 F.Supp.2d at 1308.
 
 
 42
 Considerable evidence does exist to this effect. Before the Commission, representative after representative of the domestic manufacturers stated that although they had the capability to produce cold-rolled plate, they did not. In the words of the steel executives themselves, "there just isn't [a] market for it, as we see it," "[o]ccasionally somebody will need cold-rolled product, but it's so infrequent that we just don't see a market for it," "the market for this product is almost insignificant," and "our customer needs are generally met with a hot-rolled product." At least one of the industry representatives was unfamiliar with whether his company actually produced cold-rolled plate, while an industry consultant described any production of cold-rolled plate as "accidental." Id. at 1304. In response to questioning as to whether Allegheny would ever conceivably produce cold-rolled plate, the Allegheny representative flatly stated "no." The no material injury determination of the Final Determination is grounded at least in part on this evidence. In its analysis of volume, the Commission stated, "the industry itself has characterized cold-rolled plate as a tiny and unimportant part of its business." The utility of this evidence, however, is limited by the fact that testimony from the domestic industry sources, frankly admitting little interest in cold-rolled plate due to its small volume in the domestic market, entered the record at a time when the domestic industry was pleading for a single domestic rolled plate industry.
 
 
 43
 Key to the Commission's initial determination to treat hot and cold-rolled plate as a single domestic like product, from the perspective of domestic industry, was the lack of enthusiasm of domestic industry in the market for cold-rolled plate, as aptly demonstrated by the testimony. In the Final Determination, however, the Commission relied on this lack of interest on the part of domestic industry to buttress its ultimate conclusion regarding the impact and volume assessments, these assessments being based upon flawed reliance on the entire domestic market for steel plate as a surrogate for that of cold-rolled steel plate.
 
 
 44
 Initially, Allegheny argues that we must reject any reliance on the evidence showing lack of domestic interest in cold-rolled plate. Allegheny asserts that the Supreme Court's decision in Securities and Exchange Commission v. Chenery, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), and its progeny compel reversal of the decision of the Court of International Trade, arguing that the Court of International Trade has effectively substituted its judgment for that of the Commission, in affirming the Final Determination on the basis of the lack of interest of domestic industry in the cold-rolled steel plate industry, rather than upon the volume-price-impact analysis. Admittedly, this is a close question. However, we believe that the Court did not substitute its own judgment for that of the Commission. As noted above, the Commission's evaluation of both volume and impact was informed by the underlying perception of a lack of interest on the part of domestic industry. Allegheny's Chenery argument must therefore fail.
 
 
 45
 Allegheny additionally contends that the reliance of the Court of International Trade on such evidence to affirm the Commission's decision is incorrect. Citing our decisions in Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978 (Fed.Cir.1994) and Oregon Steel Mills Inc. v. United States, 862 F.2d 1541 (Fed. Cir.1988), Allegheny attempts to portray such reliance as inconsistent with prior caselaw finding a lack of interest on the part of domestic industry. This is misplaced. Section 1677(7)(B)(ii) clearly authorizes broad evaluation of any relevant factors, stating that the Commission "may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports." Statements by industry representatives in a formal hearing before the Commission regarding their own motives behind their production, or lack thereof, of domestic like products certainly qualify as relevant. Indeed, as we noted in Suramerica, "[t]he industry best knows its own economic interests and, therefore, its views can be considered an economic factor." Suramerica, 44 F.3d at 984. The Commission is surely entitled to rely on "other economic factors," but such factors cannot replace the mandatory elements of the analysis, absent a showing that those elements, in a given case, simply cannot be assessed.
 
 
 46
 Allegheny's strongest contention is thus that the statutory language directing the Commission's work cannot be satisfied by a decision that is flawed as to all three factors in the circumstances of this case. This carries weight. Section 1677(7)(B) sets forth three factors that the Commission is directed to consider in conducting its evaluation of "material injury," using the mandatory "shall" language — price, volume, and impact. Consideration of other factors is permissive.
 
 
 47
 Our caselaw has clearly interpreted section 1677(7)(B) as requiring the Commission to evaluate each of the mandatory factors in reaching a decision. In Angus Chemical Co. v. United States, 140 F.3d 1478 (Fed.Cir.1998), we sustained a challenge to the Commission's practice of using a "two-step" analysis for material injury, first assessing whether domestic industry had indeed suffered injury, then evaluating to what extent the imported merchandise contributed to the injury. Id. at 1483. Although sustaining the Commission's "two-step" practice, the Angus court found that the statutory language of section 1677(7)(B) "unmistakably requires the Commission to consider the three listed factors in making its material injury determination." Id. at 1484. "[S]ide-stepping the statutory mandate" in considering less than all of the factors was not justified in order to reach a negative determination. Id. at 1485. As a result, the Angus court conducted a searching review of the opinions of the concurring commissioners to determine whether sufficient findings had indeed been made as to each of the price, volume, and impact factors. Id. at 1486. Under Angus, the Commission is thus obliged to conduct a good faith effort to fulfill its statutory mandate.
 
 
 48
 It is true that our caselaw does not require each of the factors set forth in section 1677(7)(B) to be correctly analyzed by the Commission in order to affirm its decision. Review of this aspect of Commission determinations takes place under the substantial evidence standard. Taiwan Semiconductor, 266 F.3d at 1344-45. Under this deferential standard, we have affirmed Commission determinations where the analysis of one of the three mandatory factors is unsupported by substantial evidence. United States Steel Group, 96 F.3d at 1364-65 (finding that even were the price-suppression determination not supported by substantial evidence, the decision could be affirmed nonetheless).
 
 
 49
 Notwithstanding the tolerance of the substantial evidence requirement for Commission determinations which contain some errors, neither the statutory language nor Angus permits a court to affirm a Final Determination which is legally flawed as to each of the three factors the Commission is obliged to consider, in circumstances showing a failure on the part of the Commission to seek the necessary information to carry out its statutory duties. The Commission is obligated by law to consider volume, price and impact in reaching its determination on the subject of material injury. It is also permitted, under 19 U.S.C. § 1677(7)(B)(ii), to "consider such other economic factors as are relevant to the determination [of material injury]." Permissive authority to consider economic factors in addition to the specific factors that must be considered does not excuse the obligation first to evaluate the mandatory volume, price and impact factors. A contrary holding would eviscerate the requirement that the Commission "consider" each of the mandatory factors. Angus stands for the proposition that the Commission must make a good faith effort to carry out its statutory mandate in conducting its review.
 
 
 50
 For the foregoing reasons, the decision of the Court of International Trade to affirm the Commission's Final Determination is incorrect.
 
 CONCLUSION
 
 51
 As each of the statutory factors which the Commission is obligated to consider under section 1677(7)(B) is legally flawed or unsupported by substantial evidence, the decision of the Court of International Trade is vacated and the case is remanded for proceedings not inconsistent with this decision.
 
 COSTS
 
 52
 No costs.
 
 
 53
 
 VACATED AND REMANDED.
 
 
 
 
 Notes:
 
 
 [1]
 The Commission's Final Determination applied only to stainless steel plate in coils, expressly excluding stainless steel plate not in coils. For ease of discussion, we will refer to the product as "steel plate" or "plate."
 
 
 [2]
 Despite stating that the "Commission's `volume' analysis was in accordance with law and supported by substantial evidence,"Allegheny, 116 F.Supp.2d at 1289, the Court of International Trade expressly noted that it evaluated substantial components of the volume analysis under other sections of the opinion. Id. at 1293. Common findings of error are consequently attributable to the volume analysis as well.
 
 
 [3]
 Indeed, the case at bar provides a good example of this, as the Commission has assessed the effect of the subject imports against the entirety of the domestic stainless steel plate market, rather than against the 0.01% of that market which comprises cold-rolled steel plate